

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

United States Courts
Southern District of Texas
FILED

APR 06 2017

HOUO71412

David J. Bradley, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* TAMMY LYNN BABCOCK<br><br>　　Relator,<br><br>　　　　v.<br><br>COASTAL HEALTH & WELLNESS, and GALVESTON COUNTY HEALTH DISTRICT<br><br>　　Defendants. | Civil Action No.<br><br>**17 CV 1055**<br><br>**ORIGINAL COMPLAINT FOR:**<br>**Violations of False Claims Act, 31 U.S.C. § 3729 *et seq.***<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)**<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Relator Tammy Babcock, for her complaint against Coastal Health & Wellness ("Coastal"), and Galveston County Health District ("GCHD"), (collectively, "Defendants"), alleges as follows:

1.　　This action is brought on behalf of Relator and the United States pursuant to the False Claims Act, 31 U.S.C. sections 3729, *et seq.*, arising from Defendants' fraudulent schemes in connection with obtaining money through federal HRSA grants, and for retaliating against Relator in violation of 31 U.S.C. §§ 3730(h).

2.　　This action concerns false and fraudulent statements, reports and claims for payment that Defendants routinely and intentionally submitted to.

### I.　　JURISDICTION AND VENUE

3.　　This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

4.      This Court has personal jurisdiction and venue over Defendants pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a). Jurisdiction is proper over the Defendants because the Defendants can be found in, reside in, and/or have transacted business within this Court's jurisdiction, and some of the acts in violation of 31 U.S.C. § 3729 occurred within this district.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) & (c) and 31 U.S.C. § 3732(a) because at least one Defendant resides in or transact business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district. Relator is familiar with Defendants' fraudulent practices alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

6.      This case is not based on a public disclosure within the meaning of the FCA, and Relator is the original source of the allegations contained herein. Relator has direct and independent knowledge of the alleged fraud and disclosed this information to the government before filing suit, pursuant to 31 U.S.C. § 3730(e)(4)(B). Relator believes that there has been no public disclosure of these allegations and transactions such that subparagraph (e)(4) does not apply and this disclosure was not necessary. However, as a precautionary measure, in the event there has been a public disclosure, Relator made a pre-complaint disclosure in order to qualify as an "original source" under subparagraph (e)(4)(B)(2).  Relator has knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transactions, and voluntarily provided the information to the Government before filing her False Claims Act complaint.

## II.     PARTIES

7.      Relator Tammy Babcock is a former employee of Coastal Health & Wellness, and a resident of Santa Fe, Galveston County, Texas.

8.      Defendant Coastal Health & Wellness is a local special-purpose governmental entity located in Galveston County, Texas and serving Galveston County from its offices located in Texas City. Its services to Galveston County include operating Galveston County's Community Health Center, with clinics in Texas City and Galveston. It can be served via its Chairperson, Milton Howard, at 9850-C Emmett F. Lowry Expressway, Texas City, Texas 77591

9.      Galveston County Health District ("GCHD"), is a political subdivision and municipal organization of the State of Texas providing governmental services to the citizens of Galveston County, Texas. It can be served via its CEO, Kathy Barroso at 9850 Emmett F. Lowry Expressway, Texas City, Texas 77591.

10.      The United States is herein named as a Plaintiff pursuant to the False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.*, as funds of the United States have been directly or indirectly paid to Defendants, as a result of the knowingly false claims, records and statements alleged in this Complaint that Defendants made or caused to be made. Through its various agencies, including the Health Resources and Services Administration ("HRSA"), the Government awards and administers federal grants.

### III.    FACTS

11.      On behalf of the United States of America, Relator files this Qui Tam Complaint against Defendants, (hereinafter, collectively "Defendants") pursuant to United States Code § 3729 et seq. (the federal False Claims Act, "FCA") to recover all damages, penalties, and other remedies under the False Claims Act, including statutory damages, treble damages, recapture and disgorgement of all wrongfully obtained funds and allege as follows:

**A.      Federally Qualified Health Centers**

3

12.    A Federally Qualified Health Center ("FQHC") is a reimbursement designation from the Bureau of Primary Health Care and the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services.

13.    The FQHC benefit under Medicare was added effective October 1, 1991, when Section 1861(aa) of the Social Security Act (the Act) was amended by Section 4161 of the Omnibus Budget Reconciliation Act of 1990.

14.    FQHCs are safety net providers that primarily engage in providing services typically furnished in an outpatient clinic. FQHCs include community health centers, and the main purpose of the FQHC Program is to enhance the provision of primary care services in medically-underserved communities.

**B.    Federal Grant To Enable Coastal To Meet The Medical Needs Of Galveston County**

15.    Doing business as Coastal Health & Wellness, the Center is a public entity FQHC with two sites serving Galveston County: one site on Galveston Island and a second site on the mainland in Texas City. The Center also has a mobile van that serves areas of the community without easy access to one of the two fixed locations.

16.    Texas is the "uninsured capital" of the United States, with more than 6.3 million Texans, including 1.2 million children, lacking health insurance. Texas uninsured rates, 1.5 to 2 times the national average, create significant problems in the financing and delivery of health care to all Texans.

17.    The overall rate of uninsured in Galveston County is 19%. For children and adolescents aged 0-18, the Region's uninsured rate of 15.4% is almost twice that of the US rate of 8.1%. 12.22% of Galveston County's population is enrolled in Medicaid.

18.    Since Texas has chosen not to expand Medicaid under the Affordable Care Act, there are 1.2 million Texans who fall into the health care coverage gap in that they are not eligible for Medicaid under traditional rules, but also not eligible for Marketplace subsidies.

19.    In Texas, Medicaid's income cap for poor parents is $3500 annually for a family of four, or 12.8% of the Federal Poverty Level, and has not been increased by the legislature for 24 years, thereby forcing poor parents with high medical needs to choose between work and health care. Further, individuals living in poverty face an increased risk of adverse outcomes related to poor health, which may lead to reduced participation in the labor market and limited opportunities to increase their income.

20.    The area served by Coastal is designated as a Medically Underserved Area, a Primary Care Health Professional Shortage Area (HPSA), and a partial Dental and Mental Health HPSA.

21.    Based on all the facts above, Coastal applied for and received a federal grant from the United States Department of Health and Human Services Health Resources and Services Administration ("HRSA"), and designation as an FQHC.

22.    In Coastal's application for the grant it knowingly made multiple false certifications as further described below. The primary wrongdoers on behalf of Defendants are Mary McClure, Warren J. Holland, Milton Howard, Harlan (Mark) Guidry, and Kathy Barroso.

23.    Pursuant to the HRSA grant, Coastal received funds for numerous and consecutive three-year competitive grants, annual Quality Improvement dollars, annual Delivery System Health Information Investment (DSHII) dollars, and were awarded Medical Malpractice coverage for providers under the Federal Tort Claims Act and were required to operate within specific guidelines and requirements outlined by HRSA.

5

C.    **Funds Received Through HRSA Grants**

24.    The number of the HRSA Grant at issue is H80CS00344. The Former Grant Number was H27CS02006. The project period was 4/1/2002 through 3/31/2019.

25.    On March 10, 2016, HRSA issued a Notice of Award (BABC 616) superseding the April 27, 2015 Notice of Award. The March 2016 Notice named Harlan Guidry as Program Director and Principal Investigator. It authorized $2,192,093 in financial assistance for the period, based on a total approved budget of $8,843,549, with $6,651,456 being the non-federal share. It was specifically made subject to terms and conditions. No financial assistance was provided pursuant to that action because the $2,192,093 in authorized financial assistance was $531,517 less than the cumulative prior awards for that budget period of $2,723,610. This revision was issued to de-obligate $531,517 from Document No. H80CS00344D0, and re-obligate it under Document No. 15H80CS00344 for the purpose of carryover on the FY 2015 award.

26.    On July 19, 2016, HRSA issued a Notice of Award (BABC 623), superseding the March 10 (or 11), 2016 Notice of Award. The July 2016 Notice named Relator, Tammy Babcock, as Program Director and Principal Investigator. It authorized $3,135,689 in financial assistance for the period, based on a total approved budget of $9,888,394, with $6,752,705 being the non-federal share. It was specifically made subject to terms and conditions. $133,971 was provided in financial assistance based on the $3,001,718 cumulative prior award. This was to authorize the carryover of an unobligated balance of $133,971 from budget period 04/01/2015 through 03/31/2016 into the current budget period.

27.    On August 15, 2016, HRSA issued a Notice of Award (BABC 619), superseding the July 19, 2016 Notice of Award. The July 2016 Notice named Relator, Tammy Babcock, as

Program Director and Principal Investigator. It authorized $3,186,502 in financial assistance for the period, based on a total approved budget of $9,939,207, with $6,752,705 being the non-federal share. It was specifically made subject to terms and conditions. $50,813 was provided in financial assistance based on the $3,135,689 cumulative prior award. This award was for the purpose of providing one-time funding for the period of September 1, 2016 – August 31, 2017, for Quality Improvement ("QI") projects as deemed appropriate by HRSA QI funding guidelines. There was also over $30,000 of carry-over funds not used for the previous year 2015-2016 for QI projects.

**D.    The 2015 Compliance Review**

28.    Coastal operated in blatant violation of multiple requirements of the grant and its designation as an FQHC for several years.

29.    Harlan (Mark) Guidry served in multiple roles (local health authority of Galveston County, CEO of GCHD, and CEO of Coastal), and retired just before the fraud came to a head during a July 14-16, 2015 Site Visit, which resulted in a Health Center Program Site Visit Report (BABC 590), outlining Coastal's failure to comply with the terms of the grant.

30.    The Report found that coastal failed to meet 8 of the 19 compliance requirements as set forth below.

| 1. Needs Assessment | Met |
| 2. Required and Additional Services | Not Met |
| 3. Staffing Requirement | Met |
| 4. Accessible Hours of Operation/Locations | Met |
| 5. After-Hours Coverage | Met |
| 6. Hospital Admitting Privileges and Continuum of Care | Not Met |
| 7. Sliding Fee Discounts | Not Met |
| 8. Quality Improvement/Assurance Plan | Met |
| 9. Key Management Staff | Not Met |

7

| 10. Contractual/Affiliation Agreements | Not Met |
| 11. Collaborative Relationships | Met |
| 12. Financial Management and Control Policies | Met |
| 13. Billing and Collections | Not Met |
| 14. Budget | Met |
| 15. Program Data Reporting Systems | Met |
| 16. Scope of Project | Met |
| 17. Board Authority | Not Met |
| 18. Board Composition | Met |
| 19. Conflict of Interest Policy | Not Met |

31.　　The Report found that Coastal failed to satisfy the "**Required and Additional Services**" requirement due to a lack of formal agreements for the provision of prenatal and obstetrical care, translation services and behavioral health services. The Report found a lack of formal agreements for prenatal and obstetric care, noting that Coastal sends pregnant women to any local OB-GYN provider the woman chooses. Coastal's staff were unaware that women needed to be tracked throughout pregnancy and their birth outcomes recorded. The transportation agreement was found to be several years out of date. The behavioral health services agreement did not meet the sliding fee specifications.

32.　　The Report required Coastal to implement formal arrangements for the care of pregnant women by an outside provider, which formal arrangements must specify the manner by which the referral will be made and managed and the process for referring women back to the center after pregnancy for follow-up care and care of their newborns. It required that these women and their newborns be tracked for UDS data and that at least one formal arrangement be in place to assure that care is available to any woman in need with Coastal acting as a patient-centered point of care.

8

33.     The Report also required Coastal to renew or initiate a transportation formal agreement and add a Sliding Fee Schedule for its behavioral health services.

34.     The Report found that Coastal failed to satisfy the "**Hospital Admitting Privileges and Continuum of Care**" requirement because Coastal had no policies and procedures or other formal arrangements with providers outside of Coastal for the hospitalization of patients.

35.     Coastal falsely stated that it used hospitalists at UTMB in Galveston and at Mainline Hospital in Texas City. In fact, Coastal simply referred its patients to emergency rooms and lacked internal policies, systems and procedures to track hospitalized patients and assure follow-up after discharge.

36.     Because Coastal had no policies and procedures or other formal arrangements. Coastal referred to a memorandum dated 4/15/2013 (BABC 342-344) that was supplied as evidence of this requirement, but these memorandums were never implemented in any way in the clinics.

37.     In 2014, 2015, and 2016, Coastal submitted FTCA applications for medical malpractice coverage, in order to obtain the federal government's medical malpractice insurance. In order to get this coverage, they had to meet the requirements. Coastal submitted this 4/15/2013 memorandum each year, and it was false. When Babcock was in charge of submitting the application in 2017, she could not use the 4/15/2013 memorandum because it was already found to be false. Babcock was charged with correcting the discrepancies. She subsequently developed policies for tracking specialty and hospitalization and had them approved by the board and put into place.

9

38.    The Report required that Coastal establish internal policies, systems or procedures that address how the care of hospitalized patients occurs, how hospital referrals are made, who is responsible for tracking and follow-up of hospitalized patients, where patients are referred, and how records of hospitalization are incorporated into the patient record. It required that Coastal establish firm arrangements with hospitalists and hospital organizations outside of Coastal that routinely receive Coastal patients to assure appropriate tracking and follow-up of Coastal patients. Written formal arrangements must address how hospitalization, discharge planning and patient tracking will occur between Coastal and the hospital or other non-Coastal provider.

39.    The Report found that Coastal failed to satisfy the **Sliding Fee Discounts** requirement set forth in Sliding Fee Scale PIN 2014-02 (which set forth rules for assessing fees based on certain factors related to a patient's ability to pay) and required Coastal to establish compliant policies and procedures.

40.    The Report found that Coastal failed to satisfy the **Key Management Staff** because of the lack of division between Coastal and the Galveston County Health District. The Report noted that Coastal's CEO for over 16 years (Harlan Guidry) resigned his position in June 2015 (right before the July 2015 visit), and that he was improperly serving simultaneously as the CEO of both Coastal and the Galveston County's Health District. The Report found that Coastal and Galveston County's Health District shared executive staff and administrative services. It required Coastal to immediately review and establish a clear document that outlines or identifies who the key management staff are for Coastal (as opposed to the staff of Galveston County's Health District.)

41.    The Report found that Coastal failed to satisfy the **Contractual/Affiliation Agreements** Not Met

10

42.    The Report also found that Coastal failed to satisfy the **Billing and Collections** requirement.

43.    The Report found that Coastal failed to satisfy the **Board Authority** requirement because Coastal's board was not independent from the Galveston County Health District's Board, and there was a lack of clarity regarding which of them were the grantee.

44.    The Report found that Coastal failed to satisfy the **Conflict of Interest Policy** because of the lack of clarity regarding whether GCHD or Coastal was really the grantee.

**E.    October 2015 Application for Federal Assistance SF-424**

45.    Relator believed she was being hired by Coastal to rectify the problems outlined in the 2015 Report.

46.    However, she soon learned that her hiring was a farce and that, rather than correcting the problems, Coastal launched a campaign to defraud HRSA into believing it was correcting the problems so Coastal could continue receiving federal dollars.

47.    Although the HRSA grant required GCHD and Coastal to operate as separate entities, GCHD had de facto complete control over Coastal. Coastal's board required Relator to get approval from GCHD's CEO (Kathy Barroso) for all decisions made regarding Coastal's operations.

48.    In order to continue receiving funds from the federal government, Coastal was required to submit an Application for Federal Assistance SF-424, which it submitted on October 16, 2015 (BABC 736).

49.    The 2015 Application was signed by Mary McClure (Coastal's Clinical Director and authorized certifying official), prior to the hiring of Relator. (BABC 740). On behalf of Coastal, McClure certified:

> By signing this application, I certify (1) to the statements contained in the list of certifications** and (2) that the statements herein are true, complete and accurate to the best of my knowledge. I also provide the required assurances** and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 218, Section 1001)
>
> ** The list of certifications and assurances, or an internet site where you may obtain this list, is contained in the announcement or agency specific instructions.

(BABC 737.)

50.    Additionally, Coastal certified that it:

> 4.    Will initiate and complete the work within the applicable time frame after receipt of approval of the awarding agency. . . [and]
>
> 18.    Will comply with all applicable requirements of all other Federal laws, executive orders, regulations, and policies governing this program.

(BABC 740.)

51.    The 2015 Application contained numerous fraudulent representations that were calculated to, and did in fact, cause the Government to continue providing funds to Coastal.

52.    In general, the basic fraud was the certification that Coastal complied with the HRSA requirement that there be a "continuum of care" for patients. In fact, there was no arrangement for the continuum of care for the self-pay, uninsured population of Galveston County, which represented 69% of patients seen by Coastal.

53.    The 2015 Application stated: "The Center uses the patient-centered medical home (PCMH) philosophy as its delivery model." (BABC 541-542.) The PCMH philosophy requires that the

> Care is coordinated and/or integrated across all elements of the complete health care system (e.g., family, public and private community based services). Care is facilitated by registries, information technology, health information exchange, and other means to assure that the patients get the indicated care where they need and want it in a culturally and linguistically appropriate manner.

12

(BABC 461).

54.    In fact, Coastal did not, and does not provide coordinated or integrated care. In fact, it did not even maintain registries or means of information exchange through the continuum of care, nor was there a process for having patients seen by specialty providers when they needed care outside of Coastal.

55.    The 2015 Application (BABC 542) states,

It includes logistical arrangements, education of the patient and family, and coordination among health professionals involved in the transition.  Seamless transition of care is essential for persons with complex care needs, which often characterizes underserved patients faced with numerous and intransigent health disparities.

56.    Again, at the time this grant was written, Coastal did not have any logistical arrangements and/or coordination among health professionals, nor any way of moving to a higher level of care within the health care system other than to send patients to the emergency room of local hospitals either by ambulance or private vehicle.

57.    The 2015 Application (BABC 543) states,

Patients requiring services not available at Coastal Health & Wellness sites are referred to other entities with which the Center has establish a relationship.

58.    This was false. Coastal has no referral arrangement for the 69% of patients who are self-pay patients. Additionally, even the insured patients who were referred to specialists, were not provided coordinated care, as Coastal had no system of tracking the care they received from specialists and no process in place to "close the loop" on these patients. Providers did not know if patients were seen unless medical records were faxed back to Coastal.

59.    The 2015 Application (BABC 543) states,

the Center has developed specific arrangements to ensure access the needed health services after-hours and on weekends. Patients needing after-hour access to contact Center providers via its after-hours answering service. Patients are then

13

routed to a member of the Center provider staff who rotates coverage, as assigned. Arrangements ensure that patients are seen in an appropriate facility if an after-hours referral is deemed necessary. Otherwise, an appointment is made the next day, if appropriate.

60.     This was false. Coastal has no such arrangements for any patient to be seen after hours other than telling them to go to the emergency room of a local hospital. None of Coastal's physicians see patients after-hours, nor do they have admitting privileges with any local hospital. The only source of after-hours coverage Coastal has available is an answering service that can take calls from patients or LabCorp (to report critical value lab results), and the answering service will refer that information to Coastal's on-call provider who can return the call to the patient or to LabCorp. If the provider feels the patient needs attention, he simply refers the patient to an emergency room. The provider never sees the patient in the clinic after hours.

61.     The 2015 Application (BABC 544) discusses after-hours coverage that refers patients to UTMB and Mainland Medical Center. However, there is no referral agreement in place to refer patients other than through the emergency department by ambulance or personal vehicle.

62.     The 2015 Application (BABC 544) discusses Obstetrics, Prenatal, and Perinatal Care, stating: "Referral options are available for late prenatal care, deliveries, and high risk conditions." This is false. While patients may be seen for their first prenatal visit by Coastal, they are told that they should choose any obstetrician that accepts Medicaid. There were no existing agreements or contracts with any OB/GYN services for transitioning patient to specialty care. Additionally, only one out of nine Coastal providers was approved to see prenatal patients.

63.     The 2015 Application (BABC 546) states that Coastal patients are referred to UTMB and Mainland Medical Center for issues beyond the scope of Coastal's capacity. However, there is no formal contract or agreement in place with either entity; therefore, patients

14

are sent by ambulance or personal vehicle to the emergency department of local hospitals. Additionally, the 2015 Application (BABC 546) insinuates that the Center makes referrals to specialty providers for medical services such as extensive diagnostic testing, when in fact there are very limited sources for specialty referral for the self-pay patients. When self-pay patients are given referrals to specialty care from UTMB, these patients receive letters from UTMB stating that there is no available funding for providing indigent care and payment for services would be expected at the time of services.

64.    The 2015 Application (BABC 547) states that Coastal has sought and obtained local support from city government, hospitals, and other supplemental care services. While there are some state grants for a few services such as Breast and Cervical Cancer Services, Title V and the Galveston County Indigent Healthcare, these services only provide an avenue for patients enrolled in these service programs. Sixty nine percent of Coastal's patients do not have health care coverage through private insurance, County Indigent, or the Affordable Care Act. These 69% of patients are regarded as self-pay patients. There are no contracts or agreements in place for those self-pay patients, who are also vulnerable. While patients who have health care coverage through private insurance, County Indigent and through the Affordable Care Act enrollment, are seen by UTMB or Mainland Medical Center specialty providers, it is not because of any contract or agreement for services with Coastal. Rather, it is because of their insurance coverage and the ability to be reimbursed for services rendered.

65.    The 2015 Application (BABC 547) refers to the case management team and the tracking of all high-risk patients for compliance with treatment regimes. While there is tracking for high-blood-pressure patients and diabetes patients (so Coastal can reap the rewards of

"Medicaid 1115 Waiver Uncompensated Care" dollars), there is no tracking of other high-risk patients.

66.    The 2015 Application (BABC 549) states, "The Center has established referral relationships for in-patient care with the University of Texas Medical Branch (UTMB) and Mainland Centers via hospitalists, which are located nearest to the two Centers.  However, the Center works collaboratively to maintain formal and informal arrangements with all local hospital systems that admit the Center patients including providing complete histories and physicals, and diagnostic studies".

67.    This is false. In fact, Coastal has no such formal or informal agreement with UTMB or Mainland Medical Center hospitalists for admitting Coastal's patients. The only avenue the Center patients have for admission to any local hospital is through the emergency department either via ambulance or personal vehicle.

68.    Galveston County no longer has a county hospital to care for the uninsured who are unable to pay for medical care. To be hospitalized, these patients must go through an emergency room, get stabilized, at which point they are discharged and must go back to a clinic and try to manage their medical conditions. Physicians who are overwhelmed, and already providing care outside their comfort level, cannot handle complex patients who have no other means to get services.

69.    If Coastal calls an ambulance to transport a patient to the emergency department, copies of pertinent medical records are sent with EMS.  This is the only way for retrieving relevant medical record information about a patient transported or sent to the local emergency department from Coastal.

70.     The 2015 Application (BABC 557) discusses diagnostic tracking of health center patients, stating: "The EHR tracking module allows care coordinators to track diagnostic testing and other services provided to health center patients and ensure appropriate follow-up, patient compliance, and documentation in the patients record". At the time this grant was written there was no policy on tracking diagnostic testing and other services.  If the patient could be seen for diagnostic testing and/or by a specialist, it was at the mercy of the providing facility to fax a copy of the results back to Coastal.  There was no proactive tracking of any specialty referral or diagnostic test performed outside of Coastal.  While there was a memorandum dated April 15, 2013 (BABC 342-344), discussing specialty referral and hospital tracking to fulfill the requirements of the Federal Tort Claims Act (FTCA) Redeeming Application, these processes were not followed and were never revisited after April 15, 2013 even though they were used as evidence of required processes in the CY 2014, 2015 and 2016 FTCA redeeming applications.

71.     In 2013 there were two memoranda written in lieu of the required HRSA board approved policies stating the Coastal had measures in place to meet these requirements. (BABC 342-344). This is and was not the case. There were no specialty referral agreements signed or even verbalized with any type of specialist except for a few sporadic UTMB residents that volunteered their time to see various types of patients at St. Vincent's House during evening hours in Galveston, TX.

72.     Coastal providers would write specialty referrals to see cardiology, gastroenterology, orthopedics, dermatology, gynecology, diagnostic radiology and other specialists that patients need to be seen by in order to diagnose and treat illnesses that could not be handled by a primary care physician. These referrals would be faxed, primarily, to UTMB and the patients would be sent letters stating that there was no funding available for indigent or

17

self-pay patients to be seen. Frequently, the patients were not even contacted or offered the option of paying out-of-pocket to see the specialist. According to the referral department, specialty referral volumes that are documented by specialty could be anywhere from 600 to 1000 referrals and the referral department never followed up with the specialty referral to ensure that the patients were being seen. Additionally, there was never any attempt made to acquire the medical record of those who were seen. If the records were sent back from the referring specialist, they were uploaded into the medical record otherwise there was not tracking through the continuum of care.

73.     Additionally, there were no contracts or agreements made with either of the two local hospitals to admit or care for Coastal patients who needed hospitalization. If the patient's condition required hospitalization, the patient was directed to go to the emergency room or the ambulance was called to transport the patient to a higher level of care.

74.     This failure to contract with local hospitals violated HRSA's "continuum of care" requirement. Coastal patients, who were self-pay patients had and still have no options to see a specialist unless they have the funds to pay out of pocket. Nor do they have any way to be admitted to the hospital without going through the emergency room. This leads to exorbitantly high medical costs, which most patients have no way of paying.

75.     In order to meet the 2013 requirements delineated by PAL 2013-05 (BABC 283 – 320 and BABC 321 – 395), the "Responsibility and Accountability for Tracking Hospitalizations of CHW Patients" memorandum and the "Procedures and Responsibility and Accountability for Referral Tracking" memorandum, both dated April 15, 2013 (BABC 342-344) were used for the 2014, 2015 and 2016 FTCA Redeeming Applications. However, these memoranda were untrue, never followed, and did not meet the requirement of Board-approved policies.

76.     Neither UTMB nor Mainland Medical financially screened patients for reduced-pay services. Galveston County residents who were seen at Coastal, 69%, of whom were self-pay patients, were not being properly followed through the continuum-of-care as required by HRSA. No Coastal physician has admitting privileges to any hospital, nor is there a county-funded hospital that patients can go to for reduced-fee services, and Coastal has no contractual agreement with any local hospital for providing hospitalization to Coastal (self-pay or insured) patients.

77.     The 2015 Application (BABC 558, Paragraph 8(g)) states that all policies are reviewed every year. While this may be true for all Board-Approved policies, it is not true for the memoranda referenced above for hospital or specialty tracking that has been a requirement of FTCA since 2013.

78.     The 2015 Application (BABC 561, Paragraph 1(g)) states that a network of private specialists in the area has been established to accommodate Coastal's patients needing specialty care and that "Several local specialists have collaborated with Coastal providers by providing referral resources, expert consultation and training at their monthly in-services." Relator saw no evidence of this while employed at Coastal and believes it is untrue.

79.     The 2015 Application (BABC 564, Paragraph 3) references a comprehensive assessment of the health care needs of the target population, which was allegedly performed in November 2012 and November 2015 in conjunction with the SACs grant application. Relator believes no such assessment was ever performed by Coastal.

80.     The 2015 Application (BABC 567-568, Paragraph 1(b)) states that although Coastal is part of the overall operations of the GCHD governmental unit, it operates as a semi-autonomous entity, with Coastal's consumer-majority Governing Board setting policy,

determining the budget, and operating Coastal, as required by the public entity model of FQHC's.

81.    This was false. In fact, Coastal was not at all semi-autonomous. GCHD's CEO (Kathy Barroso) oversaw all of Coastal's financial decisions and all financial decisions had to be approved by Barroso before they were brought to Coastal's Governing Board. Malek Bohsali, Coastal's Chief Financial Officer (CFO) served in the CFO role for both Coastal and GCHD, but reported only to the CEO of GCHD, Ms. Barroso. The only time Coastal's Governing Board has any input into its own budgets or financial decisions is when they are placed before the Governing Board for approval at the monthly meetings. However, Coastal's Governing Board has little or no discussion of Coastal's budget and financial decisions, and is not given time to review or provide input into the budget, which is solely determined by the financial staff of GCHD under direction from Barroso.

82.    Relator was supposedly hired to rectify this problem and to be the leadership of Coastal separate from GCHD. Prior to Relator's hiring, Harlan Guidry fulfilled 3 separate roles (local health authority of Galveston County, CEO of GCHD, and CEO of Coastal), and was simultaneously paid three salaries, a situation that lasted 12 years.

83.    Barroso made it clear to Relator that her hiring was simply a farce to try to trick HRSA into believing Coastal was complying with the terms of the grant. Relator was precluded from making any of the required changes and was pressured to defraud HRSA on multiple occasions, such as using Delivery System Health Information Investment (DSHII) funds for projects that, at any other time, would have been paid for by the various entities representing GCHD who collectively benefited from the upgrade in the infrastructure of the Information technology system as proposed by Kathy Barroso. (BABC 826-831.)

84.     The 2015 Application (BABC 575, Paragraph 5(b)) states that Coastal provides referrals, discharge planning, and patient tracking.  While providers may write a referral for specialty care, there were (and are) no agreements or contracts in place for the self-pay population to be seen outside of Coastal.  There was also no tracking of these referrals at the time the grant was written.

85.     The 2015 Application (BABC 585, Paragraph 2(c)) refers to training for the Governing Board Members.  At the time this grant was written there was no such training available.  Board training was not initiated until the year 2016 and completed February 18, 2017 by the Texas Association of Community Health Centers (TACHC).

**F.      The $73,125 DSHII Grant**

86.     Coastal was notified of the availability of annual funds in the amount of $73,125 for a Delivery System Health Information Investment (DSHII), because of the 3-year awarded competitive SACs Grant, submitted October 16, 2016 (BABC 736). These DSHII funds, are specifically designated for IT (information technology) advances for FQHC clinics to enhance patient care.

87.     DSHII grants are federal grants given to support health information technology enhancements to accelerate health centers' transition to value-based models of care, improve efforts to share and use information to support better decisions, and increase engagement in delivery system transformation. Submission of anticipated expenditures related to Coastal's information technology advancements were due July 20, 2017. The narrative submission was written by Paul Salvo (Chief Information Officer) and included a quote for the IT servers. Malek Bohsali (Coastal's CFO) also worked on the narrative for the submission of use of DSHII funding.

88.    Relator designated these funds for a tele-psychiatry cart, a radiology read station and an upgrade of Coastal's Electronic Dental Record software.  These requests were made (1) because Coastal struggled to get psychiatric care for its patients, (2) because Coastal was outsourcing radiology reading to a local hospital despite having a board-certified radiologist on staff, and (3) because Coastal's Electronic Dental Record software needed to be upgraded to interface with the Electronic Health Record software.

89.    Barroso insisted on using $66,375 of the $73,125 award to increase the capacity of GCHD's computer servers rather than, as required by the grant, dedicating it solely to Coastal. It was inappropriate to use the funds to enhance the computer system that was used by GCHD and which only benefited Coastal indirectly. Coastal was obligated to report the improper use of grant money and its failure to do so was fraud.

90.    Barroso asked Relator to falsely certify to HRSA that the DSHII funds were being used solely for Coastal, when they were actually used for a computer server that jointly benefited both Coastal and GCHD. Relator refused to sign. Kathy Barroso eventually signed the false certification herself and submitted it to HRSA. Barroso knew that this constituted an inappropriate use of DSHII funds because the cost up upgrading GCHD's computer server had to be shared by all the entities within GCHD that benefited from the upgrade, rather than paid solely with DSHII funds

91.    Barroso made clear that she intended to continue the practices that were found to be non-compliant in the 2015 SACs Grant Application. Relator refused to go along with these practices.

92.     After Relator continually expressed concerns about the fraud, Barroso began bringing false performance accusations about Relator to the Chairman of the Governing Board (Milton Howard) in an effort to have Relator fired.

93.     Relator was fired on December 15, 2016. She was told that the reason for her termination was that she made too many decisions without input from others.

94.     The real reason for Relator's termination was retaliation against Relator for her continued resistance regarding the improper use of the DSHII funds and Coastal's fraud in the October 2015 SACs grant application.

95.     There was no substantiation of these alleged performance issues Barroso used to get Relator terminated. Barroso claimed that Relator failed to complete certain tasks, which were in fact completed by Relator, on time and without any delay.

96.     There was no other documentation of any performance issues presented to Relator, and the Relator subsequently qualified for unemployment because of being terminated for reasons other than performance related issues.

97.     Additionally, in order to create a false justification for firing Relator, Mary McClure (who now serves as Interim Executive Director) and Kathy Barroso (GCHD CEO) drafted a false list of Relator's purported performance issues, which Kathy Barroso gave to the Governing Board executive session on December 15, 2016.

98.     These items where never discussed with Relator and there was no substantiation of these false performance claims. The list of performance issues were withheld after an open records request submitted to Galveston County Health District by the Relator. Subsequently the Office of the Attorney General Ken Paxton, ruled that GCHD had to comply with Relator's request and turn over the list of performance issues used to justify Relator's termination.

23

99.    On January 26, 2017, Coastal's CFO, Malek Bohsali, was fired. Bohsali told Relator that he was fired after he refused to follow Kathy Barroso's directive to make changes to the financial reports submitted to HRSA related to the DSHII grant and use of funds. He was written up and subsequently fired for his failure to make changes to these financial reports, which were submitted January 26, 2017 and presented at the January 26, 2017 Governing Board meeting.

100.    HRSA has repeatedly made clear through PALs (Program Assistance Letters), beginning in 2010, specifically, PAL 2013 – 05 (BABC 283 – 320) and PAL 2014 – 03 (BABC 102 - 124), that FQHC's receiving federal grant funds must have a continuum of care between the FQHC and specialty referrals and hospitalizations which tracks all medical information through the continuum of care (See BABC 290 and BABC 109).

101.    These PINs and PALs are published by HRSA to remind FQHS's of their obligations under new regulations.

102.    FQHC's like Coastal are required to have board-approved policies for specialty referrals and the ability to track the medical referrals. Additionally, FQHC physicians must have admitting privileges or the Center must have a contract with local hospitals for the continuum of care for patients of the Center.  This requirement can be found outlined on in the HRSA Health Center Compliance Manual (BABC 649 – 735). See Chapter 7: Coverage for Medical Emergencies During and After Hours, and Chapter 8: Continuity of Care and Hospital Admitting. (BABC 679 - 682.)

103.    As explained above, Coastal lacked board-approved policies for specialty referrals and for the ability to track hospital admissions.

104.   Coastal had 600-1000 specialty referrals per month going out of the clinic, 69% of which were self-pay. The vast majority of these referrals did not receive specialty care because they could not afford to pay the amount required by the specialty provider and there were no contracts or agreements with specialists to provide care at a reduced rate or through payment from Coastal. Coastal lacked contracts with group practices agreeing to see patients, resulting in its patients having no specialty care available to them.

105.   By contrast, other FQHC's that correctly operate within the terms of their grants enter into contract with hospitals and specialty groups so that their patients receive a continuum of care, which is tracked by the FQHC. For example, Brazoria County's FQHC's, which are called the Stephen F. Austin Community Health Centers, have a contract with specialty groups at UTMB.

## G.    Fraud on the Federal Government

106.   Defendants, as described herein, have knowingly and purposefully exploited the grant to improperly obtain millions of dollars in government funds.

107.   Defendants have engaged in a scheme to obtain federal grant money for projects which did not qualify for payment, and have misused and abused the federal funds they have received in order to falsely support projects that the Government never intended, or would allow, grant funds to support.

108.   Coastal carried out this scheme by, among other actions, submitting false or fraudulent grant applications, certifications of compliance, reports, and claims to the federal Government, thereby obtaining millions of dollars in payments to which they were never entitled.

109.    Defendants' ongoing scheme violates the federal False Claims Act because (as stated above) they knowingly submitted false information in order to obtain grant payments from the United States Treasury.

110.    These misrepresentations were material. But for Coastal's purposeful misrepresentations, they would not have received these funds. Had Coastal and GCHD not improperly obtained payment of these funds, the money could have been invested by the U.S. Treasury into viable projects actually qualified to receive the funds

111.    Not only did Defendants wrongfully obtain the funds, but Coastal continues to file false certifications pertaining to the projects that received grant funds so as to prevent the funds' recapture.

112.    To date Defendants have received at least $9 million in payments through fraudulent and/or false grant applications over the past 3 years.

113.    Defendants are liable for violating the False Claims Act by knowingly, or with a reckless disregard for the truth, causing the submission of false or fraudulent claims; for making, using or causing to be made or used false records or statements material to false or fraudulent claims; for making, using, or causing to be made or used false records or statements material to avoid obligations to pay or transmit money to the Government, and/or for knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the Government, including, but not limited to the submission of false or fraudulent grant applications, certifications of compliance, reports, and claims to the federal Government.

114.    Defendants further concealed their wrongful conduct by directing employees to omit, falsify, or otherwise materially alter information regarding the projects subject to this

action, as well as falsely certify Defendants' compliance with federal law, and the Terms and Conditions of the Grant Program.

115.    Relators is an Original Source within the meaning of 31 U.S.C. § 3730(e)(4)(B). She possesses direct, independent and personal knowledge of the information upon which the allegations herein are based.

## IV.    RETALIATION CLAIM

116.    Relator was terminated by Coastal, on December 15, 2016, in retaliation for her protected activity in trying to stop Coastal's fraud on the federal government.

117.    Relator's salary at the time of her termination was $118,500 per year.

118.    Relator received a favorable six-month performance review on July 28, 2016.

119.    As described above, Relator engaged in protected activity when she investigated and reported the fraudulent nature of Defendants' schemes to obtain money from the federal HRSA grants.

120.    Specifically, Relator opposed Defendants' practice of making fraudulently representations to HRSA in order to ensure that Coastal continued to receive federal funding, which practice could reasonably lead to a viable claim under the FCA and demonstrated a distinct possibility of FCA litigation.

121.    Relator's actions were motivated by her good faith belief that Defendants were committing fraud against the United States.

122.    Defendants were on notice that Relator was investigating the fraud as evidenced by their multiple conversations wherein Relator complained about these fraudulent practices. These conversations put Defendants on notice that litigation was a reasonable possibility.

123.    Defendants retaliated against Relator again by terminating her, on or about December 15, 2016, when Defendants terminated Relator's employment in retaliation for protected activities including investigating and opposing fraudulent practices by Defendants.

124.    Defendants' termination of Relator was motivated by her protected activity described in this Complaint. Her termination happened directly after the protected activity and her protected activity is the only possible cause of her termination, as she was otherwise recognized as doing an excellent job.

125.    Coastal's retaliation and discrimination inflicted damages on Relator including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, emotional distress, and litigation costs.

## V.    THE FALSE CLAIMS ACT

126.    The False Claims Act provides, *inter alia*, that any person who--

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)    conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); . . . or

(G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C.A. § 3729 (a)(1)(A-G).

127.    The term "claim" includes "any request or demand, whether under a contract or otherwise, for money . . . that—

(i)    is presented to an officer, employee, or agent of the United States; or

(ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)    provides or has provided any portion of the money or property requested or demanded; or

(II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . .

31 U.S.C.A. § 3729 (a)(2).

128.    Any person who knowingly submits a false or fraudulent claim to the Government for payment or approval (or to a contractor if the money is to be spent on the Government's behalf or to advance a Government program and the Government provides any portion of the money requested or demanded) is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each claim, plus three times the actual damages that the Government sustained. 31 U.S.C. § 3729(a). The Act also permits assessment of the civil penalty even without proof of specific damages.

129.    The FCA defines a "claim" for payment to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c). Accordingly, pursuant to the express language of the FCA and

the statutory definition of "claim," Medicaid claims submitted to state Medicaid agencies are considered to be claims presented to the federal government, and thus may give rise to liability under the FCA.

## VI.    DEFENDANTS' VIOLATIONS OF THE FCA

130.    As described above, Defendants routinely and systematically violated the FCA by wrongfully obtaining and retaining substantial funds from the Federal Government HRSA Grant # H80CS00344 and all applications, reports and funding related to this Grant Number.

131.    As described above, Coastal knowingly submits these false claims through a variety of improper schemes, including but not limited to money received via (1) Coastal's designation as an FQHC; (2) Coastal's medical malpractice insurance through the Federal Tort Claims Act; (3) the HRSA grants received; (4) the DSHII funds received; (5) the money received through the Application for Federal Assistance SF-424; (6) false assurances of compliance with the PINS and PALS; and (7) repeated false submissions of the April 15, 2013 "Responsibility and Accountability for Tracking Hospitalizations of CHW Patients" and "Procedures and Responsibility and Accountability for Referral Tracking" memoranda.

132.    As described above, these misrepresentations are material to the Government's decision to pay funds, and not require the return of funds.

133.    Defendants' false and fraudulent schemes prey on and cause harm to a socio-economically vulnerable patient population and have defrauded the Government out of large sums of money.

## VII.    VIII.  CAUSES OF ACTION

### COUNT ONE

### FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(A)

134.    All paragraphs of this Complaint are incorporated herein by reference.

135.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to officers or employees of the United States Government.

136.    As a result of these false or fraudulent claims, the United States Government suffered damages.

137.    By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval.

138.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

139.    Additionally, Coastal is liable under the implied false certification theory, because (as described above) it submitted claims to the government that included specific representations about the services Coastal was providing, thus impliedly certifying compliance with all conditions of payment. Because Coastal's claims failed to disclose its violation of material regulatory and contractual requirements, Coastal made misrepresentations that rendered the claims false or fraudulent under 31 U.S.C. § 3729(a)(1)(A). These omissions rendered Coastal's representations misleading with respect to the services provided.

140.    Coastal's misleading omissions were material to HRSA's decisions to disburse the funds in response to Coastal's claims. Coastal knowingly violated requirements that it knew were material to the Government's payment decision.

141.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False

Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015.).

**COUNT TWO**

**FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(B)**

142.   All paragraphs of this Complaint are incorporated herein by reference.

143.   Defendants knowingly made, used, or caused to be made or used, false records and statements material to the United States Government's payment of false or fraudulent claims.

144.   As a result of these false records or statements, the United States Government suffered damages.

145.   By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015.)

**COUNT THREE**

**FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(G)**

146.   All paragraphs of this Complaint are incorporated herein by reference.

147.   As described above, Defendants knowingly made, used, or caused to be made or used, false records and statements material to an obligation to pay or transmit money or property

to the Government, and knowingly concealed and knowingly and improperly avoided or decreased their obligation to repay grant money improperly obtained from the Government.

148.    Had Coastal provided accurate information to HRSA, Coastal would have had to disgorge improperly obtained payments obtained under the HRSA grants. By knowingly providing this false information, and knowingly concealing their obligation to repay the money improperly received, Defendants violated subsection (a)(1)(G).

149.    As a result of those false records and statements, and knowing concealment and improper avoidance, the United States Government has suffered damages.

### COUNT FOUR

### FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(C)

150.    All paragraphs of this Complaint are incorporated herein by reference.

151.    A defendant is liable for conspiracy if the relator can prove two elements: (1) that the defendant conspired with at least one person to get a false or fraudulent claim paid by the Government; and (2) that at least one of the conspirators performed an overt act to get a false or fraudulent claim paid.

152.    As described above, Defendants entered into an agreement to have the United States pay false or fraudulent claims by entering into a conspiracy to improperly obtain funds through HRSA grants. Thus, Defendants conspired with each other to commit the violations of 31 U.S.C. §3729(a)(1) (A), (B), and (G) described above.

153.    As described throughout this Complaint, all Defendants knew about the scheme to defraud the United States by making false records, statements and certifications in violation of 31 U.S.C. § 3729(a)(1)(A), (B), and (G). By participating in this scheme, Defendants implicitly agreed to form a conspiracy to violate 31 U.S.C. § 3729(a)(1)(A), (B), (D) and (G).

154.    Each of the Defendants committed one or more overt acts in furtherance of the conspiracy to violate 31 U.S.C. §§3729(a)(1)(A), (B), and (G), including but not limited to each time they made false records, false statements, and/or false certifications to conceal from the United States the Defendants' fraudulent scheme and false claims, and each time false claims were submitted or caused to be submitted to the United States.

155.    Defendants conspired with each other to, and did, obtain funds that benefited both Coastal and GCHD, despite knowing that the funds were only permitted to benefit Coastal.

156.    Defendants knowingly conspired with each other to make, or caused to be made, false and fraudulent claims for federal funds. Defendants, and each of them, knowingly conspired to make or caused to be made false and fraudulent statements, and/or created false records, in order to obtain federal funds through fraudulent means and in order to get false and fraudulent claims against those HRSA grants paid.

157.    Unaware of the Defendants' conspiracy or the false and fraudulent nature of the claims for funds under the federal HRSA grants, the United States – in reliance on the claims and certifications submitted therewith, – paid funds to Defendants and was damaged thereby. The amount of damages would include the total sum paid out to Coastal and/or GCHD on behalf of the United States.

158.    As a direct and proximate result of Defendants' conspiracy resulting in fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims that it would not otherwise have paid.

159.    Damages include, but are not limited to, three times the full value of all such fraudulent claims.

160.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act.

161.    Defendants are jointly and severally liable for all damages.

## COUNT FIVE

### FALSE CLAIMS ACT, 31 U.S.C. §3730(h)

162.    All paragraphs of this Complaint are incorporated herein by reference.

163.    Relator engaged in protected activity when she investigated and reported the fraudulent nature of Defendants' schemes.

164.    Relator's actions were aimed at matters that reasonably could lead to a viable claim under the FCA and/or demonstrated a distinct possibility of FCA litigation.

165.    Relator's actions were motivated by her good faith belief that Defendants were committing fraud against the United States.

166.    Defendants were on notice that Relator was investigating the fraud as evidenced by their multiple conversations wherein Relator complained about these fraudulent practices. These conversations put Coastal on notice that litigation was a reasonable possibility.

167.    Defendants retaliated against Relator by terminating her employment in retaliation for protected activities including investigating and opposing fraudulent practices by Defendants in violation of the anti-retaliation provisions of the FCA, 31 U.S.C. § 3730(h).

168.    Defendants' termination of Relator was motivated by her protected activity described in this Complaint. Her harassment and eventual termination happened directly after the protected activity and her protected activity is the only possible cause of her harassment and eventual termination, as she was otherwise recognized as doing an excellent job.

169.    Coastal's retaliation and discrimination inflicted damages on Relator including, but not limited to, past and future earnings, lost employment benefits (including health insurance

benefits and retirement contributions), job-search expenses, humiliation, mental anguish, emotional distress, litigation costs and attorneys' fees, all collectively in an amount to be determined at trial.

<u>**PRAYER**</u>

WHEREFORE, Relator prays for the following relief for her FCA claims:

1.      A permanent injunction requiring Defendants to cease and desist from violating the federal FCA;

2.      Judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of the Defendants' unlawful conduct;

3.      Civil monetary penalties for each false and fraudulent claim submitted to the United States by Defendants, as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015, and between $10,957 and $21,916 for penalties assessed after February 3, 2017.)

4.      An award to Relator pursuant to 31 U.S.C. §3730(d) of reasonable attorneys' fees, costs, and expenses;

5.      As to the retaliation claim, for: (i) past and future earnings, (ii) lost employment benefits (including health insurance benefits and retirement contributions), (iii) job-search expenses, (iv) damages for humiliation, mental anguish, and emotional distress, (v) pre and post-judgment interest and (vi) litigation costs and attorneys' fees, and (vii) any other relief that this Court deems appropriate, all collectively in an amount to be determined at trial; and

6.      Such other relief as the Court deems just and equitable.

36

## JURY DEMAND

Relator hereby demands a jury trial on all issues triable to a jury.


Dated: April 6, 2017

Respectfully submitted,

/s/ Cory S. Fein
CORY S. FEIN
CORY FEIN LAW FIRM
712 Main Street, Suite 800
Houston, TX 77002
(281) 254-7717
(530) 748 - 0601 (fax)
cory@coryfeinlaw.com

*For Relator, Tammy Babcock*